**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> LAMAR PRICE, <br><br> Defendant. | Crim. Action No. 20-974 (SDW) <br><br> **OPINION** <br><br> December 22, 2021 |

**WIGENTON**, District Judge.

Before this Court is Defendant Lamar Price's ("Price" or "Defendant") Motion to Suppress Evidence (the "Motion") pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C). For the reasons discussed below, the Motion is **GRANTED**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On May 19, 2020, a group of detectives with the Jersey City Police Department were "patrolling west bound on Madison Avenue from South 14th Street," a "high crime area," in unmarked and unconventional vehicles when they passed a group of males. (D.E. 22 at 24, D.E. 29 at 17 ¶¶ 11–21.) Detective Steven Resendes observed Defendant grabbing "an unknown item from his right jacket pocket and plac[ing] it in his front waistband." (D.E. 22 at 24.) The police officers stopped and patted Defendant down, in what they assert was a constitutional Terry stop, discovered a handgun, and arrested Defendant. (*See generally* D.E. 22.) Defendant is now charged

with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (D.E. 11 at 1.)

On June 20, 2021, Defendant filed this motion to suppress the evidence seized during that May 19, 2020 arrest. (*See generally* D.E. 22.) Defendant contends that the search violated his Fourth Amendment rights because the detectives lacked a reasonable suspicion for their stop. (*See generally id.*) The Government filed opposition and Defendant replied. (D.E. 24, 26.) An evidentiary hearing was conducted on November 10, 2021. (D.E. 29.) This Court, writing for the parties, assumes familiarity with the history of this matter and addresses only those facts relevant to deciding the present motion.

### a. Detective Steven Resendes' Incident Report

The incident report, written by Detective Resendes, described the events leading to the stop, as well as the frisk itself. A summary of the incident report follows.

The incident report stated that on May 19, 2020, at approximately 3:50 P.M., Detectives Resendes and Marc Castro were "proactively patrolling west bound on Madison Avenue from South 14th Street" in an unmarked white Crown Victoria. (D.E. 22 at 24.) Detectives Resendes and Castro were assisted by Lieutenant Anthony Venancio, driving a black unconventional Chevy Impala, and Detectives Jamie Rivera and Shaquille Johnson, driving a black unconventional Chevy Trailblazer. (*Id.*) While patrolling, Detective Resendes observed a "multitude"[1] of males walking westbound on the sidewalk. (D.E. 22 at 24.) As Detectives Resendes and Castro were passing the group of males, in their unmarked vehicle, the report states Defendant saw the vehicle, stopped, turned around to head eastbound, and observed the white Crown Victoria pull alongside the curb

---

[1] Detective Resendes observed four men, including Defendant. (Tr. 69: 14–16, 175: 7–10.) This Court does not define such group as a "multitude."

while the remaining males continued walking westbound. (*Id.*) Defendant then turned back around and "walked towards the group of males." (D.E. 22 at 24.)

As Defendant turned back around towards the group of males, Detective Resendes "observed Price grabb[ing] an unknown item from his right jacket pocket and plac[ing] it in his front waistband." (D.E. 22 at 24.) At this point, Detectives Resendes and Castro exited their vehicle and approached Defendant. (*Id.*) Detective Resendes noticed Defendant "had his right hand in his front waistband" and then "ordered Price to remove his hand." (*Id.*) The report stated that Defendant complied by "slowly removing his hand while looking both eastbound and westbound like he was looking for an avenue of escape." (*Id.*) Defendant was then detained and frisked, resulting in Detective Resendes feeling a heavy metal object near his waistband area. (*Id.*) Due to Detective Resendes' "training and experience in multiple gun arrest[s]," he believed the object was a firearm, and subsequently called out the Newark code for "gun" to the other detectives. (*Id.*) Detective Resendes "immediately placed Price under arrest" and removed a silver .25 caliber handgun from Defendant's waistband area.

   b. **Evidentiary Hearing**

Testimony was taken at the hearing from Detectives Resendes and Rivera, and Talib Kates ("Kates"), one of the men walking with Defendant at the time of the May 19th incident. (D.E. 29 ("Tr.").)

Detectives Resendes and Rivera acknowledged that the incident report and the investigation summary reports included multiple errors, including omissions. (Tr. 28:21–25, 29:1–25 ("That was a detail I left out"), 92:3–22 ("Q: So is your police report incorrect and your testimony here today truthful?" "A: Yes"), 145:12–25, 146:1–25 ("I wouldn't say it's completely

accurate"), 147: 2–10 ("Q: This report does not reflect an accurate dissertation of the answers you gave on that day?" "A: Correct").)

According to Detective Resendes' testimony, on May 19, 2020, Detectives Resendes, Castro, Rivera and Johnson, and Lieutenant Venancio were a part of the Major Crimes Unit, a plain clothes unit[2] tasked with surveillance and gathering information. (Tr. 12:9–25, 13:1–17.) It was necessary for this unit to be in plain clothes "so [the community doesn't] know [they] are police officers." (Tr. 13:12–17.)  Detective Resendes testified that at approximately 3:50 P.M., his team was patrolling in unmarked and unconventional vehicles, that were also widely known in the public as police vehicles due to Instagram posts, when Detective Resendes saw "a group of males on the southbound sidewalk walking westbound towards South 15th Street."  (Tr. 15:10–22, 16:1–25 ("Basically people post on their Instagram pages that the police are out"), 17:1–14, 24:18–21, 117:1–25 ("yeah, we drove those cars every day.  We had the same exact cars, no secret that they are cop cars.  They have lights in the front of them.  They are very noticeable").) Detective Resendes stated that when he was parallel to the group of males, he made eye contact with Defendant, through tinted windows, "at which point [D]efendant stopped, his eyes widened, [and he] immediately turned around as his friends continued walking westbound on Madison Avenue." (Tr. 23:2–13, 72:18–20 ("Q: He wouldn't have been able to see [any type of police insignia] anyway because it was tinted, right?" "A: No.").)  Throughout Detective Resendes' testimony, it was clear that Defendant's "eyes widening" was a crucial fact that led to his reasonable articulable suspicion, but Detective Resendes failed to include this in his incident report.  (Tr. 14:23 – 25, 23:2–20, 26:16–22, 42:21–25; *see generally* D.E. 22 at 24.)

---

[2] Detective Resendes testified that though he was in plain clothes, his badge hung on his chest below the window, and therefore would not have been visible to Defendant. (Tr. 73: 13–21, 74:3–8.) Similarly, Detective Rivera stated that "the words 'police' [were] on [his] chest in block lettering" about midlevel on his chest, however this would not have been visible when sitting in his car. (Tr. 142: 2–23.)

After Detective Resendes observed Defendant's "widened eyes," he testified that Defendant immediately stopped, turned around, walked "one or two steps," looked over his shoulder, stopped again, turned around again, and walked westbound towards the group of males while simultaneously "removing an [unknown] object and stuff[ing] it down his waistband." (Tr. 24:11–25; 26:1–22; 29: 6–9.) Detective Resendes stated that these actions and mannerisms combined "led up to [his] reasonable belief that [Defendant] was in possession of a weapon." (Tr. 29:6–9.) As Detectives Resendes and Rivera approached Defendant, Detective Resendes testified that Defendant "began to move his hands [and] started to look left and south on Madison Avenue" as if "he was looking for an avenue of escape." (Tr. 29:1–7, 31:11–19.) Detective Resendes then announced himself as a police officer, detained and frisked Defendant, "felt a metal object," and announced the "Newark police code for gun," causing the other detectives to "immediately converge to where [Detective Resendes] was." (Tr. 32:1–25, 33:3–25.)

Detective Rivera's testimony is largely consistent with Detective Resendes' testimony. (Tr. 114:15–16, 122:18–25, 123:1–12, 124:18–23, 126:8–16.) In addition, however, Detective Rivera testified that before Defendant recognized Detective Resendes in his unmarked car, Defendant "locked eyes" with Detective Rivera, even though Detective Rivera was following Detective Resendes. (Tr. 21:21–25, 114:15–16, 122:18–24, 123:8–12, 124:18–23.) When they "locked eyes" Detective Rivera stated that Defendant "kind of stiffened up, seemed nervous, his eyes kind of widened and faced the opposite direction." (Tr. 122:18–24.) While Detective Rivera's remaining testimony essentially mirrored Detective Resendes', it is inconsistent with what was recorded in Detective Rivera's investigation report.

In the investigation report, Detective Rivera stated that before Detectives Resendes and Castro exited their vehicle, Detective Rivera "observed P[rice] walking with a group of young

5

men." (D.E. 22 at 27.) When Defendant saw the unmarked and unconventional patrol vehicles, Detective Rivera stated that Defendant "walked towards the middle of the group of individuals [attempting] to conceal himself." (*Id.*) This is directly opposite of what he testified to in the evidentiary hearing.[3] (Tr. 123:8–23.)

Testimony was also taken from Defendant's witness Talib Kates, one of the men present with Defendant during the incident. Kates' testimony was somewhat confusing and unreliable as he recounted the incident occurring in a different area of South 14th Street and Madison Avenue, an issue that was not in dispute. (*See* Tr. 197:1–25, 198:1.) Additionally, Kates testified that he did not see a detective remove a gun from Defendant's waistband, he never learned that a gun was recovered, and he never heard that Defendant was arrested and charged with carrying a firearm, despite being lifelong friends with Defendant. (Tr. 171:25, 172:1–7, 182:4–24.) Importantly, Kates and Defendant are first cousins. (*See* 189:1–25, 190:1–10.) In sum, while Kates contradicted some of the testimony of the Detectives, his testimony showed his lack of familiarity with the event itself. (*See* Tr. 196:21–25, 197:1–25.)

## II.  DISCUSSION

### A. Applicable Law

"The Fourth Amendment protects the right to be free from 'unreasonable searches and seizures.'" *United States v. Sangster*, Crim. No. 19-3273, 2021 WL 2974635, at *2 (3d Cir. July 15, 2021); U.S. Const. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (citation omitted). In *Terry v. Ohio*, "the Supreme Court set forth an exception that allows a police officer to conduct a 'brief,

---

[3] At the time of this arrest, this unit was not equipped with body cameras. (Tr. 37:20–23.)

investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Scott*, 816 F. App'x 732, 736 (3d Cir. 2020) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *see also Terry v. Ohio*, 392 U.S. 1, 1 (1968). "Because this reasonable suspicion requirement is only triggered by a seizure, we first pinpoint the moment of the seizure and then determine whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity. *United States v. Scott*, 816 F. App'x 732, 736 (3d Cir. 2020) (internal citations and quotations omitted).

A seizure occurs when a police officer has restrained a person's liberty through physical force or a show of authority. *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Terry*, 392 U.S. at 19-20, n. 16); *see Brendlin v. California*, 551 U.S. 249, 256 (2007) (quoting *United States v. Mendenhall*, 446 U.S. 544, 545 (1980)). Therefore, for the seizure to have been appropriate, the Terry stop must have been based upon a reasonable, articulable suspicion. If the officers acted without an appropriate basis for their stop, the evidence obtained pursuant to that unconstitutional seizure must be suppressed. *See Brown*, 448 F.3d at 244.

Courts apply a "totality of the circumstances" test to assess whether an officer had a "particularized and objective basis" for suspecting wrongdoing, and account for trained officers' commonsense judgments and inferences about human behavior. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). That officer's determination of reasonable suspicion receives "significant deference." *United States v. Michael Torres*, 961 F.3d 618, 623 (3d Cir. 2020) (citation omitted); *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018). A reasonable, trained officer, however, must be capable of specifying the

7

reasons that justify the suspect's seizure. *See United States v. McCants*, 952 F.3d 416, 422 (3d Cir. 2020) (alterations in original) (quoting *Brown*, 448 F.3d at 246–47)).

### B. Analysis

Defendant argues that he was seized when Detectives Resendes and Rivera exited their unmarked vehicles, approached, and ordered Defendant "to remove his hand from his waist-band," to which he "complied by slowly removing his hand." (*See* D.E. 22 at 24); *see also Brown*, 448 F.3d at 246. There are two issues in contention: (1) whether the detectives' conduct qualified as a seizure; and (2) if so, whether the detectives' conduct was supported by reasonable suspicion. *United States v. De Castro*, 905 F.3d 676, 678 (3d Cir. 2018).

    a. <u>Defendant Was Seized When Detective Resendes Approached and Ordered Defendant to Remove his Hands</u>

During a non-consensual stop, police authority rises to the level of a seizure only when a person's freedom is restrained (1) by application of physical force, even when it is ultimately unsuccessful; or (2) a person submits to an assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (finding that because defendant did not comply with law enforcement's show of authority, he was not seized until he was restrained by physical force). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Id.* (citing *Mendenhall*, 446 U.S. at 554). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.*; *See Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018) (seizure occurs when "communication would convey to a reasonable person that compliance was not optional"). Factors

8

that indicate a seizure through show of authority include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

Detective Resendes exiting his unmarked vehicle, announcing himself as police and ordering Defendant to "to remove his hand from his waist-band," (*See* D.E. 22 at 24) is a "show of authority" that "would convey to a reasonable person that compliance was not optional." *Haberle*, 885 F.3d at 176; *see also Fla. v. Bostick*, 501 U.S. 429, 435–36 (1991) (We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual. . . . as long as the police do not convey a message that compliance with their requests is required.) (Internal citation omitted). This "show of authority" was confirmed when Defendant complied and submitted to Detective Resendes' order "by slowly removing his hand" and "put[ting his] hands in the air," while being frisked. (D.E. 22 at 24, 36.) Additionally, the detectives exhibited a "show of authority" through "the threatening presence of [three or four] officers" converging on Defendant. *Mendenhall*, 446 U.S. at 554. (*See* D.E. 22 at 24, 30, 36, 39, 42; Tr. 131:21–25, 132:1–4, 176:25, 177:1–2.) No reasonable person would believe that complying with Detective Resendes' order, coupled with the officers converging on Defendant, was optional. *See Haberle*, 885 F.3d at 176. Therefore, this event was a seizure under the Fourth Amendment.

    b. <u>The Detectives' Conduct was Not Supported by Reasonable Suspicion</u>

The Government has the initial burden to prove that a Terry stop is based on reasonable suspicion. *Wardlow*, 528 U.S. at 123. The Government argues that reasonable suspicion was met because the incident occurred "in a high-crime area. . ., Price's change of direction upon seeing

them, his movements toward the middle of the group to conceal himself and the placement of [an unknown] object . . . [into] his waistband." (D.E. 24 at 2.) During the evidentiary hearing Detective Resendes specified that his "reasonable suspicion" was based on the combination of "telltale signs" that he learned "due to [his] training and experience." (Tr. 26:16–22.) He testified that Defendant widening his eyes, immediately stopping, turning around, walking two feet, looking over his shoulder, taking an additional step, turning around again, removing an unknown object, and stuffing it down his waistband informed his reasonable suspicion. (*Id*.) Defendant contends that the detectives "had no reasonable articulable suspicion that criminal activity was afoot" for either version of events that led to Defendant's search and seizure. (D.E. 22 at 12.)

Reasonable suspicion is an "elusive concept," but requires that "the detaining officers [] have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. at 417–18. It "requires that the officer articulate something more than an inchoate and unparticularized suspicion or hunch." *Madsen v. Washington Twp. Police*, Civ. No. 20-2395, 2021 WL 3932056, at *4 (D.N.J. Sept. 2, 2021) (internal citations omitted) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "In evaluating whether reasonable suspicion existed, a court 'must consider the totality of the circumstances, including the police officer's knowledge, experience, and common-sense judgments about human behavior.'" *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012) (internal citations omitted).

Here, regardless of which version of events is true, Detectives Resendes and Rivera's alleged reasonable articulable suspicion of criminal activity relies heavily on Defendant's mannerisms of "locking eyes" with the detectives and widening his eyes in recognition that they were police officers. (Tr. 26:16–22, 32:22–24, 86:17–20, 100:18–22, 101:5–25, 122:18–24.) In order for these mannerisms to rise to reasonable articulable suspicion, Defendant must have (1)

noticed the unmarked police vehicles based on Instagram posts that have no connection to Defendant or the remaining group, (2) recognized that these unmarked vehicles were in fact the police vehicles from these unconnected Instagram posts, (3) been able to see inside the tinted windows of the police vehicles despite the vehicles driving towards him, (4) viewed the plain clothes police officers' police badges that hung on their chest below window level, in order to (5) "lock eyes" with the detectives and widen them in recognition that they were in fact police officers.  (Tr. 26:16–22, 32:22–24, 72:18–20, 73: 13–21, 74:3–8, 86:17–20, 100:18–22, 101:5–25, 122:18–24, 142: 2–23.)  Importantly, the detectives testified that Defendant was not a target, and that they had never interacted with Defendant or the surrounding group of males before this incident.  (Tr. 21:3–5 ("Q: And the defendant was not a target of your unit. . .?"  "A: No"), 117:9–17 ("Q: Nothing relating to Lamar Price?"  "A: No"), 121: 3–5 ("Q: Do you recall any interactions that you personally have had with any of [the group of males] before that day?"  "A: No").)

      This Court cannot give significant weight to the detectives' testimony regarding Defendant's mannerisms of locking and widening his eyes in this improbable series of events, especially when these supposed crucial mannerisms were not included in any of the detectives' written reports.  (*See generally* D.E. 22 at 23–34.)  *See United States v. Linear*, Crim. No. 08-207, 2008 WL 4615288, at *2 (N.D. Ill. Oct. 14, 2008); *see also United States v. Banks*, Crim. No. 07-552 (D.N.J. April 16, 2008) (the "officers' credibility [wa]s greatly tarnished" by their failures to include key details in the police report).  The police officers, despite being experienced in these types of stops and the constitutional requirements undergirding them, failed to accurately detail events in the police report, such that the report would justify a finding of

11

reasonable suspicion.  Further, the inconsistencies in the written reports have not been cured by the detectives' testimony.

Detectives Resendes and Rivera also indicated that their reasonable articulable suspicion relied on Defendant's hand movements near his waistband while being in a high crime area.  The reputation of an area for criminal activity can be used as support to justify a Terry stop, however it cannot stand alone and must be combined with other factors.  *See Brown v. Texas*, 443 U.S. 47, 52 (1979), *Brown*, 159 F.3d at 149–50.  The only remaining consideration that could also be factored into the high crime area analysis in this case is Defendant's hand movements near his waistband.   However, the Third Circuit has held, that "an individual walking away from police and making some motion towards his waistband. . . in a high-crime area, without more, does not create reasonable suspicion."  *United States v. Sears*, 835 F. App'x 671 (2020).  Because this Court is not persuaded by the detectives' testimony regarding Defendant "locking eyes" and widening them, Defendant's hand movements near his waist band while in a high crime area does not alone constitute a reasonable articulable suspicion.

Based on the factual record and the testimony elicited at the evidentiary hearing, this Court concludes that the detectives did not have a reasonable belief, based on specific and articulable facts, to conduct a Terry stop.  Because the firearm was discovered during the unlawful Terry stop, the Fourth Amendment requires that the evidence be suppressed.  *See United States v. Velasquez*, 626 F.2d 314, 318–19 (3d Cir. 1980).

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress is **GRANTED**. An appropriate order follows.

_s/ Susan D. Wigenton_
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:     Clerk
cc:       Parties